## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

UNITED STATES OF AMERICA

v.

STEVEN ALLAN DONALDSON,

Defendant.

CRIMINAL ACTION FILE
NO. 4:10-CR-47-HLM-WEJ

## **NON-FINAL REPORT AND RECOMMENDATION**

This matter is before the Court on defendant Steven Allan Donaldson's

Motion to Suppress Evidence [9]. The Court conducted an evidentiary hearing on

said Motion on February 1, 2011 [30], which has been transcribed [31]. The parties

have briefed the matter. (See Post-Hr'g Br. of Def. [32] ("Def.'s Br."); Gov't Resp.

to Def.'s Perfected Mot. Supp. [34] ("Govt.'s Br.").) On the basis of the testimony

and evidence produced at that hearing, the undersigned **REPORTS** that police did

not violate defendant's constitutional rights in interrogating him following his arrest

or in searching his vehicle, computer, and cell phone. Therefore, the undersigned

**RECOMMENDS** that defendant's Motion to Suppress Evidence [9] be **DENIED**.

## I.    STATEMENT OF FACTS

Detective Christopher Lyons of the Catoosa County Sheriff's Department posted a listing on a social networking website called BareBackRealTime.com. (Tr. 5-6.) Detective Lyons, acting in an undercover capacity, posed as the father of a 12-year-old boy who purportedly was being offered for sex. (Id. at 6.) As a result of that posting, Detective Lyons began communicating with defendant through emails and text messages, ultimately agreeing to meet in Ringgold, Georgia, on October 26, 2010, for the purpose of defendant having sexual contact with the child. (Id.) Defendant stated that he was driving from Atlanta; the two agreed to meet at a Shell gas station near Interstate 75. (Id. at 6-7.)

In anticipation of that meeting, Detective Lyons and FBI Special Agent ("SA") Ken Hillman waited at the gas station in plain clothes in an unmarked, black Mazda. (Tr. 7-8.) Two other members of their task force, including Detective David Scroggins of the Rossville Police Department, waited in plain clothes in an unmarked car where they could see the interstate exit ramp. (Id. at 7, 58.)

### A.    The Arrest

Defendant arrived at the Shell station as planned on October 26, 2010, and pulled towards the car that had been described to him. (Tr. 7, 63.) At the

2

evidentiary hearing, defendant testified to a version of the arrest that differed sharply from the testimony of the Government's witnesses. The Court summarizes each version below.

## 1. Government's Version

Defendant, who was alone in the vehicle, pulled alongside the Mazda, facing the same direction, so that when Detective Lyons exited the passenger side of his car, he was just a few feet from Mr. Donaldson in the driver's seat. (Tr. 8, 47.) SA Hillman also exited the vehicle and walked around it, so that both were next to defendant's car when they identified themselves as law enforcement and asked defendant to step out of his vehicle. (Id. at 8, 43.) Both officers carried firearms on their side, but never drew them. (Id. at 8-9, 36, 46, 54.) The officers did not yell at or threaten Mr. Donaldson. (Id. at 9, 45-46.) The Shell station's business continued as normal, despite the arrest occurring in the parking lot. (Id. at 10.)

After defendant stepped out of his car, SA Hillman informed him that he was under arrest. (Tr. 44.) The officers handcuffed defendant and patted him down. (Id. at 9.) SA Hillman explained that he was part of a federal task force that investigates crimes against children, that he did not intend to embarrass or humiliate Mr. Donaldson, and that he wanted to "get to the facts and events that surrounded him

3

driving from Atlanta to Ringgold, Georgia, thinking he was going to have some type of sexual activity with a 12-year-old male child." (Id. at 44.) SA Hillman then asked for basic biographical information needed to process the arrest, as well as whether he lived with anybody and whether there were any children in his living environment. (Id. at 44-45.) Although he did not ask any further questions, SA Hillman informed defendant that he would be transported to the police station, where officers "would like to talk to him" and where he would "have an opportunity to explain his side of the events if he wishes." (Id. at 45.) SA Hillman then walked away to notify his supervisor that the arrest had been made. (Id. at 46.)

While SA Hillman spoke with defendant, Detective Lyons proceeded with an inventory search of defendant's vehicle, assisted by the two other task force members who had arrived on the scene after Mr. Donaldson. (Tr. 9-10.)[1] Neither

---

[1] It is standard operating procedure in the Catoosa County Sheriff's Department to inventory and impound a vehicle when its driver is arrested. (Tr. 11-13, 37.) Detective Lyons seized numerous items from the cabin and trunk of defendant's car, including the following: "a Cingular cell phone, a Walgreen's bag containing one receipt that was dated October 26, 2010, from Dalton, Georgia, a box of condoms, a fleet enema, candy, two automatic teller machine ATM receipts, one M.S.I.S. 6000 laptop computer, one computer bag containing two partial lubes of lidocaine, one jar of elbow grease, one bottle of Amsterdam poppers, and a bottle of Swiss navy lubricant." (Id. at 14-15.)

4

Detective Lyons nor the other two task force members had any discussion with defendant at that time. (Id. at 9.)

While waiting for a marked unit to transport defendant, Detective Lyons heard a "passing comment" from defendant about being sick or having an ailment. (Tr. 15-16.) Upon noticing that defendant "looked kind of yellow," Detective Lyons permitted him to sit down in the back seat of his own vehicle, rather than the normal procedure of having a defendant stand or sit at the curb. (Id. at 16, 18.)[2] Detective Lyons asked defendant if he was H.I.V. positive, to which defendant answered in the affirmative. (Id. at 16.)[3] Defendant stated that he was fine and did not need medical attention. (Id.) This conversation lasted "a matter of seconds," and Detective Lyons did not ask defendant any other questions while at the gas station. (Id. at 17.)

Deputy Candice Larue arrived at the gas station within approximately ten minutes and then transported defendant to the Catoosa County Sheriff's Office. (Tr.

---

[2] SA Hillman observed that it began to drizzle about that time. (Tr. 46.)

[3] Detective Lyons explained that he had noticed that many users on the BareBackRealTime.com website were H.I.V. positive. (Tr. 16.)

5

18, 47.) No other conversation or questioning occurred at the gas station or during transport, which took approximately fifteen minutes. (Id. at 18, 46-47.)

## 2. Defendant's Version

Defendant testified that he was suspicious upon arrival at the gas station because the officers' "windows were blacked out" and there was noone waiting outside the car to greet him. (Tr. 63.) Defendant was unsure whether he put his car in park. Defendant testified, "I look up and there's three guys standing there with guns drawn and they're shouting at me, you know, 'freeze, [motherfucker].'" (Id.)

The officers opened defendant's car door, got him out, and handcuffed him. (Tr. 64.) SA Hillman said, "Look, we know all about this. We know you do this all the time. You've got about ten seconds to [] tell me the truth or I'm going to send this to federal and you'll go to jail for the rest of your life." (Id.) When defendant protested that he did not know what SA Hillman was talking about, SA Hillman "got angry" and "got in [defendant's] face," repeating the threat. (Id.) SA Hillman further intimidated Mr. Donaldson by telling him that "they rape people like you in federal prison. So . . . you better tell me everything right now." (Id. at 65.)

Not knowing what SA Hillman wanted him to say, defendant "kept stammering, stuttering around." (Tr. 65.) SA Hillman said, "You're in time out,"

6

and put defendant in the back seat of his own car and closed the door while officers searched the trunk. (Id. at 65-66.) Defendant did not give the officers permission to search his car. (Id. at 66.)

SA Hillman returned to the car twice. The first time, he asked defendant why he was not at work. (Tr. 66.) When Mr. Donaldson responded that he did not work because he was sick, SA Hillman asked whether defendant had H.I.V., and defendant responded that he did. (Id.) At that point, SA Hillman "turned and looked at the other guys and he had a big smile on his face. He goes, 'He has H.I.V. That's another charge. . . .' Then he closed the door again." (Id.)

During the search of defendant's vehicle, officers found "a very lengthy handwritten note that had been written to [Mr. Donaldson] by a dear friend who is dying of cancer." (Tr. 66.) The note identified a dog named Laura that had been adopted from the Ansley Animal Hospital. (Id. at 67.) SA Hillman asked defendant loudly and repeatedly to identify the girl, referring to Laura. (Id. at 66-67.) When defendant said that Laura is a dog, SA Hillman said, "You're back in time out," and put him back inside the car until Deputy Larue arrived to transport him to the Sheriff's office as much as thirty minutes later. (Id. at 67, 72.) Defendant did not

7

recall responding to any questions regarding the offense conduct while at the gas station.  (<u>Id.</u> at 72.)

## B. Interview at the Sheriff's Office

Upon his arrival at the Sheriff's office, defendant was held in a conference room with items that had been found in his car, including his cell phone and computer. (Tr. 19, 57.) Defendant was accompanied by Detective Scroggins, who is assigned to the FBI's Innocent Images Task Force and is the "task force member who keeps up with evidence." (<u>Id.</u> at 20, 58.)  Mr. Donaldson testified that Detective Scroggins removed his handcuffs, stating, "I'll take those handcuffs off, but if you try anything, I'll shoot you. I'll kill your ass. . . . I'm not joking." (<u>Id.</u> at 67-68.)  Detective Scroggins testified that he asked defendant biographical or booking-type questions that he used to pre-fill a <u>Miranda</u> waiver form, but he did not ask any questions regarding the offense conduct during the approximately ten minutes that the two waited for SA Hillman and Detective Lyons to arrive. (<u>Id.</u> at 58-59.)

While Detective Lyons prepared the video recording equipment in a separate interview room, SA Hillman spoke with defendant in the conference room. (<u>Id.</u> at 19, 47-48.)  After providing defendant with coffee, SA Hillman asked if officers

8

could begin searching his laptop. (Id. at 48.) According to SA Hillman, defendant agreed and provided his password, which SA Hillman wrote down. (Id.)[4] SA Hillman did not make any threats, promises, or physical contact during this conversation, and found defendant to be "very" cooperative. (Id. at 48-49.) After SA Hillman logged onto the laptop in defendant's presence, the interview room was ready and defendant was escorted there by SA Hillman and Detective Lyons. (Id. at 50.) Neither SA Hillman nor Detective Lyons questioned defendant about the offense conduct before the recorded interview. (Id. at 20-21, 49-50.)

The interview began with defendant and Detective Lyons completing a Rights Advisement/Waiver form. (Tr. 20, 22; Gov't Ex. 4 (DVD of interview); Gov't Ex. 10 (Rights Advisement/Waiver form).) Detective Lyons read the full Miranda form to defendant. (See Gov't Ex. 4.) Defendant initialed and signed the appropriate parts of the form, indicating that he understood his rights, was willing to talk about

---

[4] Defendant testified that it was Detective Scroggins who asked for the password and that he understood the request as a demand, noting that Detective Scroggins "could have guessed it anyway." (Tr. 67-68.) Defendant did not elaborate on the latter assertion. However, he reiterated that "at no point in time did I ever give anybody permission to examine the contents of my computer." (Id. at 69.) Defendant further testified that the man he believed to be Detective Scroggins was in uniform, although Detective Lyons testified that all the agents involved were in plain clothes (which the video reflects as to Messrs. Hillman and Lyons). (See id. at 7, 74.)

the investigation, and had not been threatened, coerced, or forced to answer any questions. (Gov't Exs. 4, 10; see also Tr. 76-77 (defendant's testimony regarding completion of Gov't Ex. 10, acknowledging that he understood the questions and his rights).)

Beginning at approximately the 6:38 mark in the video, Detective Lyons asked defendant to sign a form granting law enforcement permission to search his computer and cell phone. After Detective Lyons read the form aloud, Mr. Donaldson stated at the 8:06 mark, "I don't want to do that right now and I'll tell you why." Defendant explained that other people had access to his computer. (Gov't Ex. 4; Tr. 23-24.) Detective Lyons said, "That's fine. We can request a search warrant." Detective Lyons left the room at that point and returned approximately thirty seconds later.[5]

---

[5] Detective Lyons explained that other task force members already were searching defendant's computer, based upon their belief that defendant provided verbal consent when he gave his password to SA Hillman in the conference room. (Tr. 23-24, 48-49.) SA Hillman testified that he typically seeks verbal consent before the interview to expedite the search, and so he can ask questions during the interview about certain websites, profiles, and emails that are found during the search. (See id. at 51.) As noted above, defendant denies that providing his password was voluntary. (Id. at 68.) When he left the interview room, Detective Lyons told the other officers to stop their search of defendant's computer, which they did. (Id. at 24, 52.) Officers did not search defendant's cell phone until they obtained a search warrant. (Tr. 25.)

10

Later in the interview, although he had not consented to have law enforcement search his computer, the officers asked Mr. Donaldson if they could assume his online identity for the purpose of identifying other suspected child predators, and he agreed. (Tr. 27; see also Gov't Ex. 4.) The computer was brought into the interview room, but there was no internet access in that room. (Tr. 27-28.) Thus, the officers and defendant moved across the hallway to SA Hillman's office, where they had internet access but no video capability. (Id. at 28-29.) The officers made an audio recording of the remainder of the interview. (Id. at 29; Gov't Ex. 5.)

During the audio recorded portion of the interview, defendant signed a Consent to Assume Online Identity form (Gov't Ex. 11), and assisted Detective Lyons and SA Hillman in trying to locate people with whom defendant had communicated regarding sex with children. (Tr. 31-32.)[6]

At no point throughout the interview did Mr. Donaldson ask for a lawyer. (Tr. 32-33, 52, 78.) Defendant was cooperative, understood the questions, and provided answers that were responsive to the questions. (Id. at 33, 52.) He did not

_____

[6] Defendant testified that he had found Detective Lyons's communications "not plausible," and that he therefore was willing to help the Detective "improve [his] pitch and maybe only catch people who really were looking for this sort of thing." (Tr. 78-79.)

11

complain about being ill and did not appear to be under the influence of alcohol or drugs. (Id. at 33, 52.) Officers did not make any threats or promises to Mr. Donaldson, and did not physically touch him except when he was patted down incident to the arrest. (Id. at 33-34, 53.) Defendant acknowledged that the "video is reflective of reality." (Id. at 75.) Defendant further concedes that at no point in the video or audio recordings did he say anything about any threats. (Id. at 78.)

The officers applied for, and obtained, a search warrant for the cell phone and laptop that were in Mr. Donaldson's possession at the time of this arrest. (Tr. 25, 34.) No search was conducted on the computer between the time that defendant declined to sign the waiver form and the time the search warrant issued. (Id. at 26.) After obtaining the search warrant, officers took the computer to a detective in the Dalton Police Department who is a forensic examiner. (Id.)

## II.    THE CHARGING DOCUMENT

On November 8, 2010, the grand jury returned a single-count Indictment [1] against Mr. Donaldson alleging as follows:

> Beginning on or about October 21, 2010, and continuing until on or about October 26, 2010, in the Northern District of Georgia, the defendant, STEVEN ALLAN DONALDSON, using a facility and means of interstate commerce, that is, a computer connected to the Internet, knowingly attempted to persuade, induce, and entice an

12

individual who had not attained the age of 18 years to engage in sexual activity for which the defendant could be charged with a criminal offense, that is, child molestation (O.C.G.A. § 16-6-4), in violation of 18 U.S.C. § 2422(b).

## III.  **CONTENTIONS OF THE PARTIES**

Defendant asserts that, had he been permitted during the evidentiary hearing to cross examine the Government witnesses regarding the "pattern and practice of law enforcement making felony arrests with guns drawn" in similar cases, as well as Detective Scroggins's "pattern and practice of threatening individuals immediately after arrest and even threatening to shoot them," he would have been able to establish that the Government witnesses were lying about the circumstances surrounding defendant's arrest. (Def.'s Br. 2-3.) Defendant further asserts that law enforcement improperly deferred his Miranda warnings until after obtaining certain statements. (Id. at 6.) Finally, defendant argues that "[t]he Government should be prevented from admitting any evidence taken from the Defendant's computer or cell phone." (Id. at 14.) The Government responds that Miranda warnings were not required immediately upon defendant's arrest, that defendant subsequently received and waived his Miranda rights, and that no basis exists to suppress defendant's statements or the physical evidence obtained from him. (See generally Govt.'s Br.)

## IV. ANALYSIS

From the outset of these proceedings, defendant has sought diligently to pursue his theory that all evidence in this case should be suppressed because law enforcement officers "induced the accused to commit the act which the accused would not have committed except for the conduct of law enforcement officers." (Br. Supp. Mot. Suppress [9-1] at 1.) However, both this Court and the District Court have admonished defendant that an entrapment defense, regardless of its merits at trial, is not a valid basis for the suppression of evidence. (See Order of Jan. 5, 2011 [24] at 6-8; Order of Dec. 2, 2010 [17] at 4-5.) This Court's inquiry is limited to determining whether law enforcement officers violated defendant's constitutional rights when they obtained statements and evidence from him.[7]

---

[7] In light of those Orders, defendant has modified his theory somewhat, arguing that "it is one thing for the Court to deny pattern and practice evidence relating to discovery of entrapment . . . it is another thing to limit the scope of cross examination seeking to demonstrate that law enforcement was clearly lying and coving [sic] up that they arrested him with drawn guns" and threats. (Def.'s Br. 2-3.) That argument does not hold water. As the Court has informed defendant, the relevant inquiry is what law enforcement officers did in this case, not what they might have done (routinely or otherwise) in other cases. Moreover, if the Government witnesses were lying throughout the hearing as defendant contends, surely they would have lied about their "pattern and practice" as well. As discussed below, the Court finds that defendant's testimony is not credible, and therefore does not undermine the testimony of law enforcement officers who have appeared in this Court numerous times without any suggestion of dishonesty.

14

In <u>Jackson v. Denno</u>, 378 U.S. 368, 376-77 (1964), the Supreme Court held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury. Title 18 U.S.C. § 3501(a) codifies the <u>Jackson v. Denno</u> requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." <u>United States v. Davidson</u>, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985).

A two-part inquiry determines the admissibility of a confession or self-incriminating statement. First, the Court must consider whether the Government complied with the requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Second, if those requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary. <u>United States v. Jones</u>, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); <u>United States v. Sims</u>, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). The Court makes these inquiries separately below.

15

## A.    **Compliance with Miranda**

In Miranda, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. Therefore, the Court held that the procedural safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. Id. at 478-79. These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

The testimony at the hearing shows that Detective Lyons provided the Miranda rights to the defendant at the beginning of the video-recorded interview. Defendant received those rights orally and in writing. He executed a form indicating that he heard his rights and that he understood them. Thus, the first prong of the two-part inquiry has been established.

Nevertheless, defendant argues that law enforcement conducted a two-stage interrogation procedure in which he was interrogated without Miranda warnings at the gas station, and then received the required warnings before the second phase of

16

the interrogation. (See Def.'s Br. 6.) However, no Miranda warnings were necessary at the gas station because the officers asked only routine biographical questions and a question about his health during the arrest. Such questions do not constitute an interrogation within the meaning of Miranda, and are not asked for the purpose of eliciting incriminating responses. See Pennsylvania v. Muniz, 496 U.S. 582, 605 (1990); Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Further, as explained below, Mr. Donaldson's testimony about what happened at the gas station is not credible. However, even if the Court accepted that testimony, it shows that defendant made no statements at the gas station regarding the offense conduct, and the Government does not seek to admit any such statements. See United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) ("The [Supreme] Court defined 'incriminating response' as 'any response–whether inculpatory or exculpatory–that the prosecution may seek to introduce at trial.'") (quoting Innis, 446 U.S. at 301 n.5). Thus, there are no pre-Miranda warning statements to suppress.[8]

---

[8] Defendant cites Missouri v. Seibert, 542 U.S. 600 (2004), in his brief. That case concerned "the admissibility of the repeated statement" where an officer interrogated the defendant at the police station for 30 to 40 minutes without Miranda warnings, elicited incriminatory statements, took a 20 minute break, administered Miranda warnings and obtained a signed waiver of rights, and then continued the

## B. <u>Voluntariness</u>

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. <u>Jones</u>, 32 F.3d at 1516. In <u>Arizona v. Fulminate</u>, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the circumstances. In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was "causally related" to the confession. <u>Jones</u>, 32 F.3d at 1516-17. The standard applied in the Eleventh Circuit is as follows:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

<u>Id.</u> at 1517 (quoting <u>United States v. Mendoza-Cecelia</u>, 963 F.2d 1467, 1475 (11th Cir. 1992)), <u>abrogated on other grounds</u>, <u>Coleman v. Singletary</u>, 30 F.3d 1420 (11th Cir. 1994).

---

interrogation, confronting the defendant with the pre-warning statements. <u>Id.</u> at 604-05. No analogous conduct is alleged to have occurred here. Thus, defendant's reliance on <u>Missouri v. Seibert</u> is misplaced.

In this case, the undisputed evidence shows that Mr. Donaldson was not subjected to an exhaustingly long interrogation or promised anything. There is no evidence that he was unable to understand what was happening or that he was under the influence of any drugs. However, defendant alleges that he was threatened with physical harm both by SA Hillman at the gas station and by Detective Scroggins at the Sheriff's office. Those allegations, if true, would tend to make defendant's statements involuntary.

After reviewing the record, the Court concludes that defendant's self-serving allegations are not credible. Defendant offered no physical evidence or corroborating witnesses to support his version of the facts. His assertion at the hearing that Detective Lyons's "story . . . was not plausible" (Tr. 78-79), is inconsistent with his driving from Atlanta to meet Detective Lyons.[9] Most importantly, defendant's testimony is belied by the recorded interviews. Nothing in the video or audio recordings suggest that defendant had been threatened or coerced or was in any way under duress. To the contrary, defendant is calm throughout the interview. His interactions with SA Hillman and Detective Lyons

---

[9] During the interview, defendant agreed when Detective Lyons asserted that there was no dispute that the purpose of the meeting was to meet a 12-year-old boy and to have some kind of sexual contact with him. (Gov't Ex. 4.)

19

are civil in tone and he is cooperative and agreeable. In sum, the Court will not reject testimony from law enforcement officers who have testified truthfully in this Court many times, when the objective evidence in the record contradicts defendant's self-serving testimony.

Thus, under the totality of the circumstances, the Court must conclude that Mr. Donaldson made a knowing, voluntary, and intelligent waiver of his right to remain silent. Therefore, Mr. Donaldson's Motion to Suppress should be **DENIED**.

## C.    **Defendant's Computer and Cell Phone**[10]

As implied by defendant's failure to cite any authority in support of his argument that evidence obtained from defendant's computer and cell phone should be suppressed (see Def.'s Br. 13-14), that evidence is admissible. Even if law enforcement did not have defendant's consent to search his computer when that search began, probable cause to obtain a search warrant existed based on the

---

[10] At the hearing, defense counsel indicated that he also sought to suppress items found in the search of defendant's vehicle. (Tr. 4.) However, defendant did not brief that issue. The evidence shows that those items were recovered as part of a standard vehicle inventory procedure and that officers had probable cause to search the vehicle in conjunction with the arrest. Thus, the Court deems that issue abandoned and does not recommend the suppression of any evidence recovered from defendant's vehicle.

20

investigation conducted by Detective Lyons, defendant's appearance at the Shell station, and defendant's possession of those items.[11] Given that Detective Lyons had been communicating with Mr. Donaldson via email and text messages, it was likely that the computer and cell phone contained evidence of the crime for which Mr. Donaldson was arrested. See Illinois v. Gates, 462 U.S. 213, 238 (1983) (defining "probable cause" as a "fair probability that contraband or evidence of a crime will be found in a particular place."). Moreover, because the officers had probable cause to obtain a search warrant, and in fact did obtain a search warrant as soon as defendant informed them that he did not consent to the search, the discovery was inevitable. See Nix v. Williams, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received."). Thus, no grounds exist to suppress this evidence.

---

[11] The information provided in the application for the search warrant (Gov't Ex. 6) was sufficient to support a probable cause finding even without the statements about the preliminary search conducted pursuant to defendant's verbal consent. See United States v. Chaves, 169 F.3d 687, 692-93 (11th Cir. 1999).

21

## V. **CONCLUSION**

For the reasons stated above, the undersigned **RECOMMENDS** that

defendant's Motion to Suppress Evidence [9] be **DENIED**.

**SO RECOMMENDED**, this $\underline{14}$ day of April, 2011.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

STEVEN ALLAN DONALDSON,

Defendant.

CRIMINAL ACTION FILE
NO. 4:10-CR-47-HLM-WEJ

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States
Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the
Court's Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy
of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if
any, to the Non-Final Report and Recommendation within fourteen days of the
receipt of this Order. Should objections be filed, they shall specify with particularity
the alleged error(s) made (including reference by page number to any transcripts if
applicable) and shall be served upon the opposing party. The party filing objections
will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court. Failure to object to this Non-Final Report and Recommendation waives a party's right to review. Fed. R. Crim. P. 58(b)(2).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this $\underline{14}$ day of April, 2011.

Walter E. Johnson
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE