# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ROME DIVISION

UNITED STATES OF AMERICA,

v.

CRIMINAL ACTION FILE
NO. 4:10-CR-047-01-HLM

STEVEN ALLAN DONALDSON.

## ORDER

This case is before the Court on Defendant's Motion to Suppress Evidence [9], on the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [35], and on Defendant's Objections to the Non-Final Report and Recommendation [37].

## I.    Standard of Review

28 U.S.C.A. § 636(b)(1) requires that in reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions

of the report or specified proposed findings or

recommendations to which objection is made." 28 U.S.C.A.

§ 636(b)(1). The Court therefore must conduct a de novo

review if a party files "a proper, specific objection" to a

factual finding contained in the report and recommendation.

Macort v. Prem, Inc., 208 F. App'x 781, 784 (11th Cir.

2006); Jeffrey S. by Ernest S. v. State Bd. of Educ., 896

F.2d 507, 513 (11th Cir. 1990); United States v. Gaddy, 894

F.2d 1307, 1315 (11th Cir. 1990); LoConte v. Dugger, 847

F.2d 745, 750 (11th Cir. 1988). If no party files a timely

objection to a factual finding in the report and

recommendation, the Court reviews that finding for clear

error. Macort, 208 F. App'x at 784. Legal conclusions, of

course, are subject to de novo review regardless of whether

a party specifically objects. United States v. Keel, 164 F.

2

App'x 958, 961 (11th Cir. 2006); United States v. Warren, 687 F.2d 347, 347 (11th Cir. 1982).

Additionally, a district court "must defer to the magistrate judge's credibility determination 'unless his understanding of the facts appears to be unbelievable.'" United States v. Figueroa, No. 10-13515, 2011 WL 1168821, at *4 (11th Cir. Mar. 31, 2011) (quoting United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002)). In fact, the United States Court of Appeals for the Eleventh Circuit has concluded that a district judge may not reject a magistrate judge's credibility determination without first re-hearing the disputed testimony. United States v. Powell, 628 F.3d 1254, 1257 (11th Cir. 2010). A district court, however, "is not required to rehear witness testimony when accepting a magistrate judge's credibility findings."

3

United States v. Dorvilus, 357 F. App'x 239, 244 (11th Cir. 2009) (citing United States v. Raddatz, 447 U.S. 667, 674-76 (1980)).

## II. Background

### A. Factual Background

Detective Christopher Lyons of the Catoosa County, Georgia Sheriff's Department posted a listing on a social networking website called BareBackRealTime.com. (Tr. at 5-6.) Detective Lyons, acting in an undercover capacity, posed as the father of a twelve-year-old boy who was purportedly being offered for sex. (Id. at 6.) As a result of that posting, Detective Lyons began communicating with Defendant through emails and text messages. (Id.) Detective Lyons and Defendant ultimately agreed to meet in Ringgold, Georgia on October 26, 2010, for the purpose

4

of Defendant having sexual contact with the child. (Id.) Defendant stated that he was driving from Atlanta, and he and Detective Lyons agreed to meet at a Shell gasoline station near Interstate 75. (Id. at 6-7.)

In anticipation of the meeting, Detective Lyons and Federal Bureau of Investigation ("FBI") Special Agent ("SA") Ken Hillman waited at the gas station in plain clothes in an unmarked, black Mazda. (Tr. at 7-8.) Two other members of their task force, including Detective David Scroggins of the Rossville, Georgia Police Department, waited in plain clothes in an unmarked car, which was parked where they could see the interstate exit ramp. (Id. at 7, 58.)

## 1. The Arrest

On October 26, 2010, Defendant arrived at the Shell station as planned, and pulled toward the car that had been

5

described to him. (Tr. at 7, 63.) During the evidentiary hearing, Defendant's version of events differed markedly from the version of events given by the Government's witnesses. The Court follows Judge Johnson's practice of summarizing each of the two versions of events.

### a. Government's Version

According to the Government's witnesses, Defendant was alone in his vehicle and pulled alongside the Mazda, facing the same direction. (Tr. at 8, 47.) According to the Government's witnesses, Defendant's vehicle was facing in such a way that, when Detective Lyons exited the passenger side of his car, he was only a few feet from Defendant, who was in the driver's side of his own car. (Id.) SA Hillman also exited the Mazda and walked around it, so that both Detective Lyons and SA Hillman were next to

6

Defendant's car when they identified themselves as law enforcement and asked Defendant to step out of his car. (Id. at 8, 43.) Both Detective Lyons and SA Hillman carried firearms on their sides, but did not draw their weapons. (Id. at 8-9, 36, 46, 54.) The officers did not yell at, or threaten, Defendant. (Id. at 9, 45-46.) The Shell station's business continued as normal, in spite of the arrest occurring in the parking lot. (Id. at 10.)

After Defendant stepped out of his car, SA Hillman informed Defendant that he was under arrest. (Tr. at 44.) The officers handcuffed Defendant and conducted a pat-down. (Id. at 9.) SA Hillman explained that he was part of a federal task force that investigated crimes against children, that he did not intend to embarrass or humiliate Defendant, and that he wanted to "get to the facts and

7

events that surrounded him driving from Atlanta to Ringgold, Georgia, thinking he was going to have some type of sexual activity with a 12-year-old male child." (Id. at 44.) SA Hillman then asked Defendant for basic biographical information needed to process the arrest, and asked Defendant whether he lived with anyone, including any children. (Id. at 44-45.) Although SA Hillman did not ask further questions, he informed Defendant that Defendant would be transported to the police station, where officers "would like to talk to him" and where Defendant would "have an opportunity to explain his side of the events if he wishes." (Id. at 45.) SA Hillman then walked away to notify his supervisor that Defendant had been arrested. (Id. at 46.)

While SA Hillman spoke with Defendant, Detective Lyons and two other task force members, who had arrived

8

on the scene after Defendant, proceeded with an inventory search of Defendant's vehicle. (Tr. at 9-10.) In the Catoosa County Sheriff's Department, it is standard operating procedure to inventory and impound a vehicle when its driver is arrested. (Id. at 11, 13, 37.) Detective Lyons seized a number of items from the passenger compartment and trunk of Defendant's car, including: "a Cingular cell phone, a Walgreen's bag containing one receipt that was dated October 26, 2010, from Dalton, Georgia, a box of condoms, a fleet enema, candy, two automatic teller machine ATM receipts, one M.S.I.S. 6000 laptop computer, one computer bag containing two partial lubes of lidocaine, one jar of elbow grease, one bottle of Amsterdam poppers, and a bottle of Swiss navy lubricant." (Id. at 14-15.) Neither

9

Detective Lyons nor the other two task force officers had any discussion with Defendant at that time. (Id. at 9.)

While the officers waited for a marked unit to transport Defendant, Detective Lyons heard a "passing comment" from Defendant about being sick or having an ailment. (Tr. at 15-16.) After noticing that Defendant "looked kind of yellow," Detective Lyons allowed Defendant to sit down in the back seat of his own vehicle, instead of following the normal procedure of having a defendant stand or sit at the curb. (Id. at 16, 18.)[1]

Detective Lyons asked Defendant if he was H.I.V. positive, and Defendant responded affirmatively. (Tr. at 16.) According to Detective Lyons, he had noticed that many

---

[1]At approximately the same time, it began drizzling. (Tr. at 46.)

10

users of the BareBackRealTime.com website were H.I.V. positive. (Id. at 16.) Defendant stated that he was fine and that he did not need medical attention. (Id.) The conversation lasted only "a matter of seconds," and Detective Lyons asked no more questions of Defendant at the gas station. (Id. at 17.)

Within approximately ten minutes, Deputy Candice Larue arrived at the gas station. (Tr. at 18, 47.) Deputy Larue then transported Defendant to the Catoosa County Sheriff's Office. (Id.) No other questioning or conversations occurred at the gas station or during the approximately fifteen-minute transport to the Sheriff's Office. (Id. at 18, 46-47.)

## b. Defendant's Version

According to Defendant, he became suspicious when he arrived at the gas station, because the officers' "windows were blacked out" and no one was waiting outside the car to greet him. (Tr. at 68.) Defendant could not recall whether he put his car in park. (Id.) Defendant testified: "I look up and there's three guys standing there with guns drawn and they're shouting at me, you know, 'freeze, [motherfucker].'" (Id.)

According to Defendant, the officers opened Defendant's car door, got Defendant out, and handcuffed him. (Tr. at 64.) Defendant contends that SA Hillman said, "Look, we know all about this. We know you do this all the time. You've got about ten seconds to [] tell me the truth or I'm going to send this to federal and you'll go to jail for the

12

rest of your life." (Id.) According to Defendant, when he protested that he did not know what SA Hillman was talking about, SA Hillman "got angry" and "got in [Defendant's] face," repeating the threat. (Id.) Defendant contends that SA Hillman further intimidated him by stating, "[T]hey rape people like you in federal prison. So . . . you better tell me everything right now." (Id. at 65.)

According to Defendant, he did not know what SA Hillman wanted him to say, and "kept stammering, stuttering around." (Tr. at 65.) Defendant contends that SA Hillman said, "You're in time out," and put Defendant in the back seat of his own car and closed the door, while officers searched the trunk. (Id. at 65-66.) Defendant states that he did not give the officers permission to search his car. (Id. at 66.)

13

According to Defendant, SA Hillman returned to the car twice. (Tr. at 66.) Defendant testified that, on the first occasion, SA Hillman asked him why he was not at work, and when Defendant responded that he did not work because he was sick, SA Hillman asked whether Defendant had H.I.V. (Id.) According to Defendant, when he responded that he had H.I.V., SA Hillman "turned and looked at the other guys and he had a big smile on his face. He goes, 'He has H.I.V. That's another charge. . . .' Then he closed the door again." (Id.)

Defendant testified that, during the search of his vehicle, the officers found "a very lengthy handwritten note that had been written to [Defendant] by a dear friend who is dying from cancer," and that the note identified a dog named Laura that had been adopted from the Ansley

14

Animal Hospital. (Tr. at 66-67.) According to Defendant, SA Hillman asked him loudly and repeatedly to identify the girl, referring to "Laura." (Id.) Defendant contends that, when he responded that Laura was a dog, SA Hillman stated, "You're back in time out," and put Defendant back inside the car until Deputy Larue arrived to transport Defendant to the Sheriff's Office as much as thirty minutes later. (Id. at 67, 72.) Defendant testified that he did not recall responding to questions regarding the offense conduct while at the gas station. (Id. at 72.)

## 2. Interview at the Sheriff's Office

After Defendant arrived at the Sheriff's Office, he was held in a conference room with items that had been found inside his car, including his cell phone and computer. (Tr. at 19, 57.) Defendant was accompanied by Detective

15

Scroggins, who is assigned to the FBI's Innocent Images Task Force and who serves as the "task force member who keeps up with evidence." (Id. at 20, 58.) Defendant testified that Detective Scroggins removed Defendant's handcuffs, stating, "I'll take those handcuffs off, but if you try anything, I'll shoot you. I'll kill your ass. . . . I'm not joking." (Id. at 67-68.) Detective Scroggins testified that he asked Defendant biographical or booking-type questions that he used to pre-fill a Miranda waiver form, but that he did not ask Defendant any questions concerning the offense conduct during the approximately ten minutes that Defendant and Detective Scroggins waited for SA Hillman and Detective Lyons to arrive. (Id. at 58-59.)

While Detective Lyons prepared video recording equipment in a separate interview room, SA Hillman spoke

with Defendant in the original conference room. (Tr. at 19,

47-48.) After providing Defendant with coffee, SA Hillman

asked if the officers could begin searching Defendant's

laptop. (Id. at 48.) According to SA Hillman, Defendant

agreed and provided his password, which SA Hillman wrote

down. (Id.) SA Hillman testified that he made no threats or

promises and engaged in no physical contact during that

conversation, and that he found Defendant to be "very"

cooperative. (Id. at 48-49.)

Defendant, however, testified that Detective Scroggins

asked for the password and that Defendant understood the

request as a demand, noting that Detective Scroggins

"could have guessed it anyway," without elaborating. (Tr. at

67-68.) Defendant testified that "at no point in time did I

ever give anybody permission to examine the contents of

17

my computer." (Id. at 69.) Defendant also testified that the individual whom he believed was Detective Scroggins was in uniform; however, Detective Lyons testified that all of the agents involved were in plain clothes. (Id. at 7, 74.)[2]

SA Hillman logged onto the laptop in Defendant's presence. (Tr. at 50.) At that point, the interview room was ready, and Detective Lyons and SA Hillman escorted Defendant there. (Id.) Neither SA Hillman nor Detective Lyons questioned Defendant about the offense conduct before the recorded interview. (Id. at 20-21, 49-50.)

The interview began with Defendant and Detective Lyons completing a Rights Advisement/Waiver form. (Tr. at 20, 22; Gov't Ex. 4 (DVD of interview); Gov't Ex. 10 (Rights

---

[2]Judge Johnson noted that the videotape reflected that SA Hillman and Detective Lyons were the agents involved in the interview.

18

Advisement/Waiver form).) Detective Lyons read the full Miranda form to Defendant. (Gov't Ex. 4.) Defendant initialed and signed the appropriate parts of the form, indicating that he understood his rights, that he was willing to talk about the investigation, and that he had not been threatened, coerced, or forced to answer any questions. (Gov't Exs. 4, 10; Tr. at 76-77.)

Beginning at approximately the 6:38 mark on the video, Detective Lyons asked Defendant to sign a form granting law enforcement permission to search his computer and cell phone. (Gov't Ex. 4.) After Detective Lyons read the form aloud, Defendant stated, at the 8:06 mark, "I don't want to do that right now and I'll tell you why." (Id.) Defendant explained that other people had access to his computer. (Id.; Tr. at 23-24.) Detective Lyons stated, "That's fine. We

19

can request a search warrant." (Gov't Ex. 4.) At that point,

Detective Lyons left the room, returning approximately thirty

seconds later. (Id.)[3]

Later in the interview, even though Defendant had not

consented to have law enforcement search his computer,

the officers asked Defendant if they could assume his online

identity for the purpose of identifying other suspected child

predators, and Defendant agreed. (Tr. at 27; Gov't Ex. 4.)

Defendant's computer was brought into the interview room;

---

[3]Detective Lyons testified that other task force members already were searching Defendant's computer, based on their belief that Defendant provided verbal consent to search when he gave his password to SA Hillman in the conference room. (Tr. at 23-24, 48-49.) SA Hillman testified that he typically seeks verbal consent before interviewing a defendant to expedite the search, and to allow him to ask questions during the interview about certain websites, profiles, and emails found during the search. (Id. at 51.) When Detective Lyons left the interview room, he told the other officers to stop their search of Defendant's computer, and they did so. (Id. at 24, 52.) The officers did not search Defendant's cell phone until after they obtained a search warrant. (Id. at 25.)

however, the interview room had no internet access. (Tr. at 27-28.) The officers and Defendant therefore moved across the hallway to SA Hillman's office, where they had internet access but no video capability. (Id. at 28-29.) The officers made an audio recording of the rest of the interview. (Id. at 29; Gov't Ex. 5.)

During the audio recorded portion of the interview, Defendant signed a Consent to Assume Online Interview form (Gov't Ex. 11), and assisted Detective Lyons and SA Hillman in trying to locate people with whom Defendant had communicated concerning sex with children. (Tr. at 31-32.) Defendant testified that he had found Detective Lyons' communications "not plausible," and that Defendant therefore was willing to help Detective Lyons "improve [his] pitch and maybe only catch people who really were looking

21

for this sort of thing." (Id. at 78-79.)

During the interview, Defendant never asked for a lawyer. (Tr. at 32-33, 52, 78.) Defendant was cooperative, understood the questions asked, and provided answers that were responsive to the questions. (Id. at 33, 52.) Defendant did not complain about being ill, and did not appear to be under the influence of alcohol or drugs. (Id.) The officers made no threats or promises to Defendant, and did not physically touch him except for patting him down incident to the arrest. (Id. at 33-34, 53.) Defendant acknowledged that the "video is reflective of reality," and conceded that he did not mention any threats during the video or audio recordings. (Id. at 75, 78.)

The officers applied for, and obtained, a search warrant for the cell phone and computer that were in Defendant's

possession at the time of his arrest. (Tr. at 25, 34.) The

officers did not conduct a search on the computer between

the time that Defendant declined to sign the waiver form

and the time of issuance of the search warrant. (Id. at 26.)

After obtaining the search warrant, the officers took the

computer to a detective in the Dalton, Georgia Police

Department who is a forensic examiner. (Id.)

## B. Procedural Background

On November 8, 2010, a federal grand jury sitting in the

Northern District of Georgia returned an indictment against

Defendant that stated, in relevant part:

> Beginning on or about October 21, 2010, and
> continuing until on or about October 26, 2010, in
> the Northern District of Georgia, the defendant,
> STEVEN ALLEN DONALDSON, using a facility
> and means of interstate commerce, that is, a
> computer connected to the Internet, knowingly
> attempted to persuade, induce, and entice an

individual who had not attained the age of 18 years to engage in sexual activity for which the defendant could be charged with a criminal offense, that is, child molestation (O.C.G.A. § 16-6-4), in violation of 18 U.S.C. § 2422(b).

(Docket Entry No. 1.) On November 23, 2010, Defendant

filed a Motion to Suppress. (Docket Entry No. 9.)

On April 14, 2011, Judge Johnson issued his Non-Final

Report and Recommendation, in which he recommends that

the Court deny Defendant's Motion to Suppress. (Docket

Entry No. 35.) Defendant has filed Objections to the Non-

Final Report and Recommendation, and the Court

consequently finds that this matter is ripe for resolution by

the Court.

## III. Discussion

### A. Initial Matters

As an initial matter, the Court agrees with Judge

24

Johnson that "an entrapment defense, regardless of its

merits at trial, is not a valid basis for the suppression of

evidence." (Non-Final Report & Recommendation at 14.)

Consequently, Judge Johnson properly limited his inquiry

"to determining whether law enforcement officers violated

defendant's constitutional rights when they obtained

statements and evidence from him." (Id.) In his Objections,

Defendant contends that Judge Johnson improperly denied

cross examination:

> regarding the pattern and practice of law
> enforcement officers making felony arrest with
> guns drawn when arresting Craigslist and
> BarebackRT scam victims which would have
> shown that the testimony of law enforcement at
> the hearing was untruthful in covering up
> contending that they did not in [sic] have guns
> drawn, were not dressed in full flack jackets and
> did not threaten or say anything to the Defendant
> at the time of his arrest.

(Def.'s Objs. at 1-2.) The Court agrees with Judge Johnson that such cross-examination and related evidence simply is irrelevant for purposes of the instant Motion, and concludes that Judge Johnson did not improperly limit cross-examination on those topics. Consequently, Judge Johnson's credibility findings are not, as Defendant contends, improper. The Court therefore overrules this portion of Defendant's Objections, and denies Defendant's request for the Court to reopen the record, continue the evidentiary hearing, and allow cross-examination and rebuttal witnesses "to demonstrate the pattern and practice of law enforcement arresting at gunpoint and threatening individuals entrapped in the Craigslist scams." (Id. at 3.)

## B. Admissibility of Statements

As Judge Johnson noted, the Supreme Court has held

26

that a defendant has a constitutional right to'a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury. Jackson v. Denno, 378 U.S. 368, 376-77 (1964). 18 U.S.C. § 3501(a) provides that, before a court receives a confession or incriminating statement in evidence, a trial judge "shall, out of the presence of the jury, determine any issue as to voluntariness." 18 U.S.C. § 3501(a).

When determining whether a confession or self-incriminating statement is valid, the Court must conduct a two-part inquiry. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994). First, the Court must consider whether the Government complied with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). Id. If so, the

27

Court then must determine whether the confession or self-incriminating statement was voluntary. Id.

## 1. Compliance With Miranda

In Miranda, the Supreme Court stated that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subject to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. Consequently, "[p]rocedural safeguards must be employed to protect the privilege." Id. at 478-49. Those so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

The Court agrees with Judge Johnson that:

28

> The testimony at the hearing shows that Detective Lyons provided the Miranda rights to [Defendant] at the beginning of the video-recorded interview. Defendant received those rights orally and in writing. He executed a form indicating that he heard his rights and that he understood them. Thus, the first prong of the two-part inquiry is satisfied.

(Non-Final Report & Recommendation at 16.) Defendant, however, "argues that law enforcement conducted a two-stage interrogation procedure in which [Defendant] was interrogated without Miranda warnings at the gas station, and then received the required warnings before the second phase of the interrogation." (Id. at 16-17.) The Court agrees with Judge Johnson that "no Miranda warnings were necessary at the gas station because the officers asked only routine biographical questions and a question about his health during the arrest," and "[s]uch questions do not

29

constitute an interrogation within the meaning of Miranda,

and are not asked for the purpose of eliciting incriminating

responses." (Id. at 17.) The Court overrules Defendant's

Objections to this portion of the Non-Final Report and

Recommendation.

The Court also agrees with Judge Johnson that

Defendant's "testimony about what happened at the gas

station is not credible." (Non-Final Report &

Recommendation at 17.)[4] As Judge Johnson noted:

> However, even if the Court accepted that
> testimony, it shows that [D]efendant made no
> statements at the gas station regarding the

---

[4]For the reasons discussed supra, the Court overrules the
portion of Defendant's Objections in which Defendant contends that
Judge Johnson improperly found Defendant's testimony not to be
credible because Judge Johnson erroneously limited cross
examination concerning Defendant's belief that law enforcement
engaged in a pattern and practice of lying and covering up, as well
as arresting individuals with drawn guns and threatening
individuals.

offense conduct, and the Government does not seek to admit any such statements. Thus, there are no pre-Miranda warning statements to suppress.

(Id. (citation omitted).) The Court therefore overrules Defendant's Objections to this portion of the Non-Final Report and Recommendation.[5]

For the reasons discussed above, the Court agrees with Judge Johnson that the first prong of the admissibility test is satisfied. The Court therefore adopts this portion of the Non-Final Report and Recommendation, and overrules Defendant's corresponding Objections.

## 2. Voluntariness

"The determination of whether a confession is voluntary

___

[5]The Court further agrees with Judge Johnson that Defendant's reliance on Missouri v. Seibert, 542 U.S. 600 (2004), is misplaced. (Non-Final Report & Recommendation at 17-18 n.8.) The Court consequently overrules the corresponding portions of Defendant's Objections.

depends on 'whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice.'" Jones, 32 F.3d at 1516 (quoting United States v. Vera, 701 F.2d 1349, 1364 (11th Cir. 1983)) (internal quotation marks omitted). "In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was 'causally related' to the confession." Id. at 1516-17 (quoting United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1988)) (internal quotation marks omitted). The Eleventh Circuit has observed that:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of any physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative

defendants, are normally insufficient to preclude free choice.

Id. at 1517 (quoting Mendoza-Cecelia, 963 F.2d at 1475).

As Judge Johnson observed, "the undisputed evidence shows that [Defendant] was not subjected to an exhaustingly long interrogation or promised anything," and no evidence indicates that Defendant "was unable to understand what was happening or that he was under the influence of any drugs." (Non-Final Report & Recommendation at 19.) Judge Johnson also properly found that Defendant's testimony concerning alleged threats of physical harm from SA Hillman and Detective Scroggins was not credible. (Id.)[6] As Judge Johnson noted:

---

[6]As discussed supra, Judge Johnson properly evaluated Defendant's credibility, notwithstanding Defendant's contentions that Judge Johnson improperly limited the scope of cross-examination. The Court consequently overrules Defendant's corresponding Objections on this issue.

Defendant offered no physical evidence or corroborating witnesses to support his version of the facts. His assertion at the hearing that Detective Lyons's 'story . . . was not plausible' is inconsistent with his driving from Atlanta to meet Detective Lyons. Most importantly, [D]efendant's testimony is belied by the recorded interviews. Nothing in the video or audio recordings suggest[s] that [D]efendant had been threatened or coerced or was in any way under duress. To the contrary, [D]efendant is calm throughout the interview. His interactions with SA Hillman and Detective Lyons are civil in tone and he is cooperative and agreeable. In sum, the Court will not reject testimony from law enforcement officers who have testified truthfully in this Court many times, when the objective evidence in the record contradicts [D]efendant's self-serving testimony.

(Id. at 19-20 (citation and footnote omitted).)

For the reasons discussed above, the Court agrees with Judge Johnson that Defendant's confession was voluntary. The Court consequently adopts this portion of the Non-Final Report and Recommendation, and overrules

34

Defendant's corresponding Objections.

### 3. Summary

For the reasons discussed above, Judge Johnson properly found that Defendant made a knowing, voluntary, and intelligent waiver of his right to remain silent. Defendant's confession and self-incriminating statements consequently are admissible. The Court therefore adopts this portion of the Non-Final Report and Recommendation, overrules Defendant's corresponding Objections, and denies Defendant's Motion to Suppress Evidence.

## B. Defendant's Computer and Cell Phone

As Judge Johnson observed, Defendant initially failed to cite any authority in support of his argument requesting that the Court suppress evidence obtained from his computer and cell phone. (Non-Final Report &

35

Recommendation at 20.) Instead, Defendant waited until he

filed his Objections to cite authority concerning evidence

seized from his computer and cell phone. (Def.'s Objs. at

14-17.) In any event, the Court agrees with Judge Johnson

that such evidence is admissible. (Non-Final Report &

Recommendation at 20.) As Judge Johnson noted:

> Even if law enforcement did not have
> [D]efendant's consent to search his computer
> when that search began, probable cause to obtain
> a search warrant existed based on the
> investigation conducted by Detective Lyons,
> [D]efendant's appearance at the Shell station, and
> [D]efendant's possession of those items. Given
> that Detective Lyons had been communicating
> with [Defendant] via email and text messages, it
> was likely that the computer and cell phone
> contained evidence of the crime for which
> [Defendant] was arrested. Moreover, because the
> officers had probable cause to obtain a search
> warrant, and in fact did obtain a search warrant as
> soon as [D]efendant informed them that he did not
> consent to the search, the discovery was
> inevitable.

(Id. at 20-21 (citations and footnote omitted).)[7]  The Court consequently agrees with Judge Johnson that "no grounds exist to suppress this evidence."  (Id. at 21.)  The Court therefore adopts this portion of the Non-Final Report and Recommendation, overrules Defendant's corresponding Objections, and denies the Motion to Suppress Evidence with respect to evidence obtained from the search of Defendant's computer and cell phone.

## C.  Defendant's Vehicle

Although Defendant's counsel indicated during the suppression hearing that he sought to suppress items found in the search of Defendant's vehicle, Defendant's counsel

---

[7]Judge Johnson correctly noted that "[t]he information provided in the application for the search warrant was sufficient to support a probable cause finding even without the statements about the preliminary search conducted pursuant to [D]efendant's verbal consent."  (Non-Final Report & Recommendation at 21 n.11.)

did not address that issue in his post-hearing brief. (Tr. at 4.) In any event, the Court agrees with Judge Johnson that evidence seized from Defendant's vehicle is not subject to suppression because "those items were recovered as part of a standard vehicle inventory procedure and . . . officers had probable cause to search the vehicle in conjunction with the arrest." (Non-Final Report & Recommendation at 20 n.10.) The Court consequently overrules Defendant's Objections, if any, to this portion of the Non-Final Report and Recommendation, and denies any portion of the Motion to Suppress Evidence that seeks to suppress evidence seized during the search of Defendant's vehicle.

## IV. Conclusion

ACCORDINGLY, the Court **ADOPTS** the Non-Final Report and Recommendation of United States Magistrate

38

Judge Walter E. Johnson [35], **OVERRULES** Defendant's Objections to the Non-Final Report and Recommendation [37], and **DENIES** Defendant's Motion to Suppress Evidence [9].

IT IS SO ORDERED, this the 26 day of April, 2011.

_____
UNITED STATES DISTRICT JUDGE